UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TREDELL SMITH | CIVIL ACTION |
| VERSUS | NO. 14-1559 |
| NEW ORLEANS CITY ET AL. | SECTION (3) |

### ORDER AND REASONS

Defendants have filed a Motion for Summary Judgement.[1] Plaintiff, Tredell Smith, opposes the motion.[2] For the reasons below, the motion is granted.

**I.   Background**[3]

On the evening of July 6, 2013, Smith was socializing with family and acquaintances outside a home in New Orleans on North Roman Street, near an intersection with Columbus Street.[4] New Orleans Police Department officers Shelton Abram and Joseph Hebert were proactively patrolling the neighborhood because of a recent shooting incident.[5] They observed that Smith matched the description of the

---

[1] R. Doc. 74.
[2] R. Doc. 75.
[3] As it must at this stage, the Court construes disputed facts in Smith's favor. That said, Smith does not controvert most of the facts set forth in the motion for summary judgment. *See* Local Rule 56.2.
[4] R. Doc. 75-1, ¶ 1.
[5] R. Doc. 74-2, ¶ 1.

1

perpetrator.[6] When Officers Abram and Joseph Hebert approached the group, Smith fled.[7] While fleeing, he dropped a handgun.[8]

The patrol officers called for a K-9 unit and Special Weapons and Tactics (SWAT) team to assist in the arrest of a potentially dangerous suspect.[9] Officer Standeford arrived as part of the K-9 unit. Patrol officers advised him that Smith matched the description of the perpetrator in a shooting incident, was attempting to evade arrest, and had dropped a handgun.[10] Smith testified that, after officers "screamed, 'I'm about to release these dogs,'" he ran into the North Roman home.[11]

The SWAT team searched the North Roman Street house but did not find Smith.[12] Officer Standeford then prepared his canine, "Bo," to conduct a search of the area.[13] Officer Standeford did not know whether Smith had carried any weapons other than the dropped handgun or whether he had re-armed himself during the pursuit or in the home.[14]

---

[6] R. Doc. 74-2, ¶ 3.
[7] R. Doc. 75-1, ¶¶ 2–3.
[8] R. Doc. 74-3, ¶ 6 (Standeford declaration). Smith pleaded guilty to possession of a firearm or weapon by a felon in connection with the charges that followed. R. Doc. 74-4 at 2.
[9] R. Doc. 74-3, ¶¶ 4,7.
[10] *Id.* ¶ 6.
[11] R. Doc. 75-6 at 8:17-18.
[12] R. Doc. 74-3, ¶ 7.
[13] *Id.* ¶¶ 8–9.
[14] *Id.* ¶ 7.

2

Officer Standeford and Bo searched the area around the North Roman house, then moved to Columbus Street. Police gave, and Smith heard, a K-9 warning.[15] Smith testified that that he heard officers "screaming they're about to release dogs. I'm like, oh, no, so I went under the house"[16] on Columbus Street.[17] Smith denies hearing any additional warning after he crawled under the house.[18]

Bo indicated that Smith may be under a house on Columbus Street.[19] Officer Standeford knelt and attempted to see Smith, but he was unable to do so.[20] Officer Standeford sent Bo to search under the house.[21] Bo began to air scent, proceeded to the residence next door on Columbus Street, and immediately went underneath the house.[22] Bo apprehended Smith and bit him twice—once on the right side of the face and once on his lip—in an attempt to obtain a grip on Smith.[23] Smith began yelling and, within seconds, indicated that he would come out from under the house.[24] Officer

---

[15] R. Doc. 74-3, ¶ 10.  Officer Standeford reports that he gave "three loud and clear K9 warnings toward the rear yard to give Smith ample time to comply and surrender to police." *See id.*
[16] R. Doc. 75-6 at 9:22–25.
[17] R. Doc. 75-6 at 9:22-25. The Columbus Street house abutted the property line of the North Roman house.  R. Doc. 74-3, ¶ 10.
[18] R. Doc. 75-6 at 23.
[19] R. Doc. 74-3, ¶ 12.
[20] *Id.*
[21] R. Doc. 75-1, ¶¶ 5–6; R. Doc. 74-3, ¶ 13.
[22] R. Doc. 74-3, ¶ 13.
[23] R. Doc. 75-6 at 24:20–26:4.
[24] R. Doc. 74-3, ¶ 13.

Standeford immediately commanded Bo to release him.[25] Bo then retreated, and Smith was ordered to emerge.[26] Smith began crawling out.[27]

When Smith's body was halfway out from under the house, Bo bit him again, this time near the left side of his jaw.[28] Smith does not allege that officers instructed Bo to do so. Rather, Smith asserts, Bo decided to bite Smith as he emerged. According to Smith, officers attempted to call off and pull off Bo. Smith testified:

> So [Bo] waited until, like, half of my body was out and then he attacked me again. And that's when the police was able to, like, get him off me by screaming whatever they screamed. First, they screamed in English, and then they screamed something in another language, and then he obeyed.[29]
> ***
> So when he – by my jugular on my left side, they was grabbing him by his collar and with a vest, a safety vest. They was trying to get him off me like this. . . .That's how I knew the cop was trying to stop him because he didn't want to listen.[30]

Other than the implicit delay in switching from one language to another, Smith has not presented evidence of any delay by officers in calling off Bo. Officers handcuffed Smith and awaited the arrival of an ambulance.[31] Bo's bites caused Smith's permanent disfigurement and neurological issues.[32]

---

[25] *Id.*
[26] *Id.* ¶ 13.
[27] *Id.* It is unclear whether Smith heard the officers call off Bo, but it is undisputed that Bo retreated. R. Doc. 75-1, ¶ 8.
[28] R. Doc. 75-6 at 25:5–277.
[29] R. Doc. 75-6 at 27:6–12.
[30] R. Doc 75-6 at 28:13–20.
[31] *Id.* at 26.
[32] *Id.* at 5, 29–32, 35–37.

4

In connection with the incident, Smith was charged with possession of a firearm by a felon, illegal carrying of a weapon while possessing narcotics, possession with intent to distribute marijuana, and flight from an officer.[33] Smith pled guilty to possession of marijuana, second offense, and possession of a firearm or weapon by a felon.[34] He received a five-year sentence.[35]

Smith filed his lawsuit on July 6, 2014.[36] In January 2016, Smith requested and the Court granted an administrative stay of the proceedings pending his release from incarceration so that he could "more fully participate in the preparation of his case."[37] Smith was apparently released from custody in 2018.[38] He did not move to reopen the matter, however, until September 2023.[39] The parties consented to proceed before the U.S. Magistrate Judge, and a bench trial was set for October 2024.[40] After the matter was re-allotted to the undersigned, the parties jointly requested a continuance, including because of the need for further discovery and because Smith was again incarcerated.[41] To accommodate the need for discovery and

---

[33] R. Doc. 74-3, ¶ 14.
[34] R. Doc. 74-4.
[35] R. Doc. 1, ¶ 15.
[36] R. Doc. 1.
[37] R. Doc. 38 at 1.
[38] This date is recited by Defendants and not contested by Smith, and it is also consistent with the imposition of a five-year sentence in November 2013, which the record confirms. R. Doc. 74-4 at 2.
[39] R. Doc. 43.
[40] R. Doc. 53.
[41] R. Doc. 56.

Smith's incarceration, the Court issued a new Scheduling Order, setting a discovery deadline of November 13, 2025, and a bench trial date of January 12, 2025.[42]

## II. Standard of Law

Summary judgment is appropriate if a movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *S. Ins. Co. v. Affiliated FM Ins. Co.*, 830 F.3d 337, 343 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party shows "that there is an absence of evidence to support the non-moving party's cause," the nonmoving party must come forward with "specific facts" showing a genuine factual issue for trial. *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Celotex*, 477 U.S. 317 at 325).

"Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id.*; *Chambers v. Sears*

---

[42] R. Doc. 59.

6

*Roebuck & Co.*, 428 F. App'x 400, 419 n.54 (5th Cir. 2011); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807 (5th Cir. 2007). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting Anderson, 477 U.S. at 248). The Court, "construes 'all facts and inferences in the light most favorable to the nonmoving party.'" *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)). An actual controversy also exists "when both parties have submitted evidence of contradictory facts." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023) (quotation omitted).

**III.   Analysis**

    **A.   Smith's *Monell* claims fail, and he is not entitled to an additional opportunity for discovery under Rule 56(d).**

Smith's claims against the City of New Orleans must satisfy *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). A claim against a city employee in his official capacity is, in essence, a claim against the city. Thus, *Monell* also applies to Smith's claims against Superintendent Serpas and the officers in their official capacities. Under *Monell*, plaintiffs must establish the existence of (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010). These requirements ensure courts "distinguish individual violations perpetrated by

7

local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citations omitted). In short, "municipalities cannot be held liable for constitutional torts under § 1983 'on a respondeat superior theory,' but they can be held liable 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Burge v. Par. of St. Tammany*, 187 F.3d 452, 470–71 (5th Cir. 1999) (quoting *Monell*, 436 U.S. at 691, 694).

Smith has not set forth any evidence of an official policy or custom at issue in this case.[43] Instead, he merely repeats the Complaint's conclusory allegations.[44] Thus, Defendants are entitled to summary judgment on the *Monell* claims.

Smith attempts to avoid summary judgment on his *Monell* claims by invoking Rule 56(d). That rule states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). To obtain time for discovery under Rule 56(d), Smith must make two showings. First, he must establish that "additional discovery will create a genuine issue of material fact." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797,

---

[43] R. Doc. 75-1.
[44] R. Doc. 75 at 3.

8

816 (5th Cir. 2017) (quotation omitted). Second, he must establish that he "diligently pursued discovery." *Id.* (quotation omitted).

Smith propounded his first set of written discovery requests on the evening of Friday, October 10, 2025.[45] Smith's affidavit states that the requests at issue go to "policies, customs, trainings, records of complaints, investigations and personnel files of Defendants which are solely in Defendants' custody."[46] But the record confirms that Smith did not diligently pursue discovery. Thus, Smith cannot now complain that he lacks information that goes to "the heart of plaintiff's claims in this matter."[47]

Smith filed this lawsuit in July 2014.[48] He has been represented by counsel for the duration of the litigation. Although the matter was stayed between January 19, 2016, and September 23, 2023, there has been ample opportunity for discovery outside that period.[49] Yet Smith served no written discovery nor attempted to depose any fact witnesses.[50] It was only after Defendants indicated they were filing a motion for summary judgment based on qualified immunity that Smith propounded his first set of interrogatories and requests for production.[51]

---

[45] R. Doc. 75-2.
[46] R. Doc. 75-4, ¶ 4.
[47] R. Doc. 75-4, ¶ 1.
[48] R. Doc. 1.
[49] Further, it appears that Smith was dilatory in moving to reopen the case after he finished serving his sentence in 2018.
[50] Only Smith's deposition was taken. *See* R. Doc. 76 at 5.
[51] *See* R. Doc. 63 (October 7, 2025 minute entry noting Defendants' intent to move for summary judgment).

Smith complains in his November 10 opposition that Defendants did not respond to his requests. This overlooks the fact that the 30-day deadline to do so had not yet expired. Moreover, Smith did not move to compel responses nor seek an extension of the discovery deadline. *See Jacked Up, L.L.C.*, 854 F.3d at 816 ("Jacked Up did not move to compel production of these documents during the discovery period—the first time it sought judicial assistance in obtaining these documents was in response to Smucker's summary judgment motion."). Presumably that is because there is no good cause to extend the deadlines in this case, which was filed more than a decade ago. Smith has provided no explanation for his delay, and the information sought is of the bread-and-butter variety in any *Monell* case. Thus, Smith's request for additional time for discovery under Rule 56(d) is denied.

### B.   Smith has not set forth evidence supporting his excessive force claims against Officers Lewis, Hebert, and Abram.

Smith's statement of material facts contains no specific allegations against Officers Lewis, Hebert, and Abram. Defendants' statement of facts, in turn, states only that Officers Abram and Hebert were the patrol officers who identified Smith as matching the description of the shooter and, once Smith was in custody, advised him of his rights and arrested him.[52] Plainly this evidence is insufficient to set forth a claim that survives summary judgment.

---

[52] R. Doc. 74-2, ¶¶ 1–4, 11.

In briefing, Smith argues that his claims against Hebert and Abram are based on their failure to intervene when Smith "was surrounded by officers as the attack by Bo was allowed to continue."[53] Smith's own testimony contradicts this argument. Smith testified that he was subject to two attacks by Bo.[54] The first occurred when Smith was under the house. The undisputed evidence reflects that it was Officer Standeford who instructed Bo to search that area and to stop biting Smith once he indicated an intent to emerge. The second occurred when Smith crawled out from under the house.[55] According to Smith, the (unnamed) officers present were "screaming" at Bo to release Smith and physically grabbing Bo to pull him off Smith. Thus, here too, there is no basis for liability.

### C. The officer defendants are entitled to qualified immunity.

"Government officials may invoke qualified immunity to shield themselves 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Shumpert v. City of Tupelo*, 905 F.3d 310, 319–20 (5th Cir. 2018), as revised (Sept. 25, 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Once defendants invoke qualified immunity, the plaintiff bears the burden of negating that defense. *See id.* at 320. In evaluating whether to grant a motion for summary judgment based on qualified immunity, courts must "decide (1) whether an officer's

---

[53] R. Doc. 75 at 14.
[54] R. Doc. 75-6 at 14–16.
[55] R. Doc. 75-6 at 7.

11

conduct violated a federal right and (2) whether this right was clearly established." *Id.* These steps may be considered in either order. *Id.*

In excessive-force claims, the reasonableness of an officer's conduct depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Court must adopt "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted).

Even where force is excessive, qualified immunity will apply "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.*" Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation and quotation omitted). Although Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citation and quotation omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation and quotation omitted).

### 1. Officer Standeford is entitled to qualified immunity for his decision to release Bo.

Smith alleges that Officer Standeford violated his Fourth Amendment rights by applying excessive force in releasing Bo while Smith was hiding under the house.[56] "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 656 (2014). To prevail on an excessive-force claim, he must show "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (citations omitted).

Smith meets the injury requirement.[57] The Court thus evaluates whether the use of force was reasonable under the *Graham* factors. The first factor, severity of the crime, weighs against him. Smith was the suspect in a shooting incident and was evading arrest. *See Salazar v. Molina,* 37 F.4th 278, 282 (5th Cir. 2022) (noting that "serious" offenses include evading arrest with a vehicle, DUI, and interfering with the duties of a public servant). Smith does not dispute the severity of the underlying crime.

The second factor, whether Smith posed an immediate threat, also weighs against him. Smith fled from officers, dropped a handgun, and hid under a house at

---

[56] R. Doc. 1, ¶ 20.
[57] R. Doc. 75-6 at 5, 29–32, 35–37.

night. Thus, the officers were unable to observe Smith, but they had reason to believe that he may be armed. Moreover, although Smith had heard at least one set of K-9 warnings, he gave no indication that he intended to surrender prior to Bo's release.

The third factor, whether Smith was resisting or attempting to flee, "largely folds into the second." *Salazar*, 37 F.4th at 282. Given that Smith refused to surrender and continued to evade arrest even after hearing a K-9 warning, a reasonable officer may believe that Smith would continue to attempt to flee or resist after he crawled under the house. Thus, the *Graham* factors support the conclusion that Bo's release to apprehend Smith was objectively reasonable.

In arguing to the contrary, Smith relies on the Fifth Circuit's decision in *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016). In that case, a DUI suspect fled into a small wood-fenced area used to store trash bins between houses. *See id.* at 521. There was no reason to believe the suspect was armed. *See id.* An officer called for backup, and a K-9 unit responded. *Id.* No K-9 warning was given.[58] Although the parties dispute whether the dog was ordered to do so, it is undisputed that the dog in *Cooper* began biting the suspect and continued to do so for one to two minutes. *Id.* The suspect's hands were visible and there was no indication of a weapon. *Id.* Even after the suspect complied with an order to lay on his stomach, however, the officer did not order the dog to release the bite until the suspect was fully handcuffed. *See id.* The Fifth Circuit

---

[58] *See Cooper v. Brown*, 156 F. Supp. 3d 818, 819 (N.D. Miss.) *aff'd in part, appeal dismissed in part,* 844 F.3d 517 (5th Cir. 2016).

concluded that allowing the dog to continue biting a "compliant and non-threatening arrestee" was objectively unreasonable such that it constituted excessive force. *See id.* at 524. The Fifth Circuit further concluded that the right to be free from such force was clearly established at the time. The police had "'fair warning' that subjecting a compliant and non-threatening arrestee to a lengthy dog attack was objectively unreasonable." *See id.* at 525.

Smith's reliance on *Cooper* is unavailing. "Importantly, the initial bite was not at issue in *Cooper*, as the record indicated that [the officer] did not give a bite command." *See Shumpert v. City of Tupelo,* 905 F.3d at 332 n.43.[59] Moreover, no K-9 warning was given in *Cooper*. Here, Smith testified that he heard the K-9 warning—indeed, that is the reason he gave for crawling under the house. Moreover, Smith presented greater indicia of danger to police than were present in *Cooper*. Smith was the suspect in a shooting incident, fled police to evade apprehension, dropped a handgun during the chase, hid under a house, and ignored threats that dogs would be released—all of which occurred at night in a residential neighborhood. Further, and unlike in *Cooper*, Smith has not presented any evidence that the police allowed the dog bites to continue even after he was compliant. To the contrary, the uncontroverted evidence indicates that Officer Standeford commanded Bo to release

---

[59] The Fifth Circuit stated in *Cooper* that "The parties dispute whether Sunny initiated the attack or whether, instead, [an officer] ordered it." 844 F.3d at 521. It further explained that this dispute was "not material to our holding. Even if the dog attacked of its own volition, [the officer] permitted the attack to continue for one to two minutes." *See id.* at 524 n.6.

Smith immediately once he indicated an intent to emerge. Smith himself testified that, after he began yelling, Bo retreated. Thus, Smith's claim premised on Bo's initial bites is unlike *Cooper*.

Defendants correctly note that *Shumpert v. City of Tupelo*, 905 F.3d 310 (5th Cir. 2018), presents facts more analogous to Smith's case. In *Shumpert*, police pulled over a suspect for a driving violation, but they had been surveilling him based on the suspicion that he was involved in narcotics activities. *See id.* at 315. The suspect stopped his vehicle and fled on foot into a nearby neighborhood. An officer eventually located the suspect hiding in a crawl space under a house. After he was warned that dogs may be released, the suspect crawled further under the house. The officer then released his dog, which bit the suspect. *See id.* at 315. The Fifth Circuit did not address whether the officer's action in releasing the dog constituted excessive force and instead found that the police were entitled to qualified immunity based on the absence of a violation of a clearly established law. The Court emphasized that (as with Smith) the suspect ignored an officer's warnings and "retreated further under the home, preventing [the officer] from determining whether he was armed." *See Id.* at 323. Thus, *Shumpert* demonstrates that the absence of a clearly established law provides another basis to conclude that qualified immunity applies to Smith's claims.

2. **Officer Standeford and the other officers are entitled to qualified immunity relative to Bo's subsequent bite of Smith as he emerged from under the house.**

16

Officer Standeford and his co-defendant officers are entitled to qualified immunity relative to the claims arising from the alleged[60] third and final bite by Bo. As with the initial dog bites, the first *Graham* factor continues to weigh against Smith.

The second factor, whether Smith posed a threat, also continues to weigh against Smith. Even after Bo retreated and Smith partially crawled out from under the house, a reasonable officer could believe that Smith may remain armed and dangerous. Smith went to considerable lengths to conceal himself, and his decision to crawl out was the product of Bo's biting such that it was not entirely of Smith's own volition. Given that Smith remained half-concealed under the house at the time of his next encounter with Bo, there was no way for officers to assess firsthand whether he was armed or had a weapon within easy reach.

The third factor also continues to weigh against Smith at this stage, albeit with perhaps less force. Given that Smith began crawling out from under the house only after being bitten by Bo, a reasonable officer may doubt the sincerity of his intent to surrender. It would be objectively reasonable to believe Smith's surrender may be a "ploy" given his prior evasion and the fact that he was "unrestrained, in close

---

[60] The declaration submitted by Defendants does not mention any such second attack. Similarly, Smith's Complaint raises only allegations relative to the attack that occurred while he was hidden under the house. It appears that Smith first raised the second attack theory (*i.e.*, that Bo bit Smith one last time as he crawled out from under the house) after the Fifth Circuit issued its decision in *Shumpert v. City of Tupelo*, 905 F.3d 310, 323 (5th Cir. 2018), relative to the use of a police dog to apprehend a suspect hiding underneath a house.

proximity to the officers, and potentially in possession of a weapon." *Salazar*, 37 F.4th at 282.

In *Benfer v. City of Baytown, Texas*, 120 F.4th 1272, 1284 (5th Cir. 2024), *cert. denied,* 145 S. Ct. 1313 (2025), the Fifth Circuit found an officer's use of force was objectively reasonable under similar circumstances. The suspect in that case had initially resisted arrest and disobeyed police commands, but he became compliant at the time that officers began to handcuff him. *Id.* at 1283–84. The Court concluded that, a reasonable officer could find under such circumstances the suspect posed a threat. *See id.* at 1284. The Court then went on to hold that,

> "Even if Benfer had demonstrated that he posed no objective or subjective threat to [the officer] or that he would not resist arrest or flee if the K-9 was released, [the officer] attempted to release the K-9's grip on Benfer ***before*** finishing handcuffing him. "Thus, [the officer] did not permit the K-9 to continue biting Benfer. [The officer] attempted to cease the use of force, albeit unsuccessfully."

*Id*. The Court concluded in *Benfer* that the use of the dog was objectively reasonable and not clearly excessive under the circumstances. *See id.* Similarly, under *Benfer,* even if Smith "had demonstrated that he posed no objective or subjective threat" and that "he would not resist arrest or flee," the officers were not objectively unreasonable because they were attempting to "cease the use of force, albeit unsuccessfully." *See id.*

### 3. The Court declines to exercise supplemental jurisdiction.

For the reasons set forth above, the § 1983 claims are dismissed. 28 U.S.C. § 1367(c)(3) grants a district court the discretion to retain or decline supplemental

jurisdiction once it has dismissed all claims over which it has original jurisdiction. In exercising that discretion, courts consider "judicial economy, convenience, fairness, and comity." *Brim v. ExxonMobil Pipeline Co.*, 213 F. App'x 303, 305 (5th Cir. 2007). "As a general rule, a federal court should decline to exercise jurisdiction over pendent state claims when all federal claims are disposed of prior to trial." *Id.*

Although this case was filed ten years ago, only one deposition has been taken, and written discovery has been minimal. The parties may use any existing research and discovery in state court. Thus, judicial economy supports dismissal of the state law claims. "Moreover, allowing Louisiana courts to rule on Louisiana law encourages fairness between the parties by 'procuring for them a surer-footed reading of applicable law." *Littlejohn v. New Orleans City*, 493 F. Supp. 3d 509, 523 (E.D. La. 2020) (citation and quotation omitted). Given the lack of diligence by Smith in this litigation, dismissal of his state law claims is not unduly prejudicial. Should Smith decide to proceed in state court, it will promote the important interest of comity.

## IV.     Conclusion

Using a police dog to apprehend a suspect is not *per se* unconstitutional. It can become so, however, when officers instruct or allow the dog to continue biting despite a suspect's compliance. *See Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016). That did not happen here. The undisputed facts indicate that: (1) Smith, the suspect in a shooting incident, fled under a house at night after police warned that they would release Bo; (2) Officer Standeford used Bo to apprehend Smith, but immediately

called off Bo when Smith indicated that he would emerge; and (3) Bo decided to bite Smith again as he emerged from the house, but officers immediately called off Bo and physically pulled him off Smith. Although the resulting injuries were serious, the actions of the officers were constitutional.

Accordingly,

**IT IS ORDERED** that Defendants' Motion (R. Doc. 74) is **GRANTED**. Smith's § 1983 claims are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Smith's state-law claims are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, this 22nd day of December, 2025.

_____
EVA J. DOSSIER
UNITED STATES MAGISTRATE JUDGE